UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
UNITED STATES OF AMERICA,

        -against-                                    **MEMORANDUM AND ORDER**

DONTAE SEBBERN and DEXTER WAITERS,              10 Cr. 87 (SLT)

                       Defendants.
-----------------------------------------------------------------x
**TOWNES, United States District Judge:**

Defendant Dexter Waiters moves to suppress "all physical evidence" taken from him at the time of his arrest as "fruits of an unreasonable seizure." On November 28, 2012, this Court conducted a hearing with respect to this motion. The only witness who testified at hearing was New York City Police Officer Richard Ortiz, the officer who arrested Mr. Waiters on November 7, 2009.

## *FACTS*

Officer Ortiz testified that at approximately 4:30 a.m. on November 7, 2009, he and five other New York City police officers from the 120th Precinct's Midnight Anti-crime Team were at 201 Arlington Avenue in Staten Island, investigating a report that shots had been fired in that vicinity (4-7, 18).[1] At around 4:50 a.m., the officers received a report via police radio that shots had also been fired at the Holland Houses, an apartment complex located a few blocks away (7-8, 18-19, 27-28). Officer Ortiz was familiar with the Holland Houses, having gone there approximately 50 or 60 times over his 11½ years in the Anti-crime Team in response to reports of shootings, robberies, assaults and domestic disputes (7-8, 22).

The officers immediately responded to that radio transmission by driving to the Holland Houses (19). The Officers drove in two cars, the first of which was occupied by Sergeant Tai

---

[1] Numbers in parentheses denote pages in the transcript of the November 28, 2012, hearing.

and his chauffeur, Officer Piscopo (8). Ortiz and the three remaining officers – Officers Pena, Kim and Arguello – followed in a second, unmarked car (8-9). Although they drove quickly – at approximately 40 to 45 miles per hour – and exceeded the 35 mile-per-hour speed limit (21), traffic was so light at that hour that the officers did not use their emergency lights during the one- to one-and-one-half-minute drive to the Holland Houses (19-20).

As the car carrying Ortiz and his three fellow officers was proceeding north on Holland Avenue, they encountered a black Mercedes Benz driving west "at a high rate of speed" on Benjamin Place, a road running along the southern border of the Holland Houses (10, 21). The Mercedes ran though a stop sign on the corner of Benjamin Place and Holland Avenue, nearly striking the officers' car (10). After swerving to avoid a collision, the officers engaged their vehicle's emergency lights and siren, but the Mercedes continued "going at a high rate a speed" (11-12, 23).

The officers pursued the Mercedes for about a block, at which point the Mercedes turned right into a parking lot at the Holland Houses (11-12, 24). After making the turn, the Mercedes stopped momentarily while one of the passengers exited the vehicle and began running toward one of the Holland Houses (12, 24). Officers Pena and Arguello promptly gave chase, but Officers Ortiz and Kim (hereafter, the "Officers") remained in the unmarked police car (12-13, 24-25).

Immediately after the man fled the car, the Mercedes continued further into the parking lot, with the police car – its lights still flashing – in pursuit (13). Seconds later, the Mercedes stopped again and two more men – the driver and another passenger – fled the car (13, 25).

Officer Ortiz initially pursued the driver, but subsequently abandoned that chase and joined Kim in pursuing the passenger (13-14).

After a brief chase across the parking lot, the man – later identified as defendant Waiters – tripped and fell (14-15). Although the Officers approached him with their guns drawn, Waiters did not immediately submit to the Officers' authority (14). After a "little bit of a fight," the Officers "were able to place handcuffs on him, at which point [they] were able to pat him down for weapons" (14). The Officers did not recover any weapons, but discovered that Waiters was wearing a military-grade bullet proof vest (14-15, 27).

Ortiz subsequently returned with Waiters to the Mercedes (16). On the ground near that vehicle, Ortiz observed a silver gun (16). There was no evidence offered at the hearing to suggest that this weapon was connected with defendant Waiters.

This Court notes that Officer Ortiz's testimony is largely consistent with set forth in an affidavit submitted by Waiters in connection with this motion. Waiters states that he was driving a motor vehicle in the vicinity of 85 Holland Avenue in Staten Island at approximately 4:55 a.m. on November 7, 2009, when he was pulled over by a police car. Affidavit of Dexter Waiters dated Nov. 5, 2010 ("Waiters Affidavit"), at ¶¶2, 5-6. Waiters further states that "[i]n response to being stopped by the police," he ran from the vehicle. *Id*. at ¶8. In addition, Waiters acknowledges that "the police claim to have recovered a loaded 9 millimeter handgun" from the car after he fled, *id*. at ¶9, although he does not allege any connection with this weapon.

However, Waiters' version of events differs from Officer Ortiz's account in two major respects. First, Waiters states that he was the driver, rather than a passenger, in the Mercedes. Waiters Affidavit at ¶3. Second, Waiters denies having done anything to warrant the traffic stop,

stating that he was "in compliance with all relevant traffic rules," *id*.; that the vehicle he was driving "was in proper working order," *id*. at ¶4; that his headlights and tail lights were illuminated, *id*., and that he "had engaged in no illegal activity prior to be approached by the police," *id*. at ¶7. However, Waiters did not testify or offer any evidence at the hearing. This Court credits the testimony of Officer Ortiz in its entirety.

*Defendant Waiters' Motion*

In his memorandum of law in support of his suppression motion, Waiters argues that the police did not have reasonable suspicion of criminal activity prior to stopping his car. Waiters asserts that the police observed nothing other than "young black men driving a car in the early morning hours." Waiters' Memorandum of Law in Support of his Omnibus Motion (the "Waiters Memorandum") at 7.

In its written response to Waiters' motion, the government does not contest Waiters' standing to seek suppression of the gun or raise any procedural issues relating to the motion. Rather, the government addresses the merits of Waiters' motion, arguing that the traffic stop was constitutional and that the handgun was both in plain view and abandoned.

## DISCUSSION

"Under the Fourth Amendment, made applicable to the States by the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643 (1961), the people are 'to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . .'" *Maryland v. Pringle*, 540 U.S. 366, 369 (2003) (quoting U.S. Const., amend. IV.). Although the Fourth Amendment itself "contains no provision expressly precluding the use of evidence obtained in violation of its commands," the courts have created an exclusionary rule, "designed to safeguard

against future violations of Fourth Amendment rights through the rule's general deterrent effect." *Arizona v. Evans*, 514 U.S. 1, 10 (1995). The exclusionary rule encompasses the so-called "fruit of the poisonous tree" doctrine, developed in the Fourth Amendment context in *Wong Sun v. United States*, 371 U.S. 471(1963), under which "evidence otherwise admissible but discovered as a result of an earlier [Constituitonal] violation is excluded as tainted, lest the law encourage future violations." *Missouri v. Seibert*, 542 U.S. 600, 612 n.4 (2004). Waiters invokes this doctrine in this case, asserting that the police lacked reasonable suspicion of criminal activity at the time they initiated the traffic stop and that all fruits of his unlawful seizure should be suppressed.

"The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.'" *Brendlin v. California*, 551 U.S. 249, 255 (2007) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *United States v. Whren*, 517 U.S. 806, 810 (1996). "The reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810 (citing *Prouse*, 440 U.S. at 659; *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (*per curiam*)).

The government has established by a preponderance of the evidence that the police had probable cause to believe that the Mercedes had committed a traffic violation. Officer Ortiz

testified that he personally observed the automobile run a stop sign – a violation of Section 1172(a) of New York State's Vehicle and Traffic Law. This Court credits Ortiz's testimony, which was not controverted by the defense. Since Ortiz had probable cause to believe that the Mercedes had committed a traffic violation, the decision to stop the automobile was entirely reasonable. *See Whren*, 517 U.S. at 810.

Ortiz's observations also gave them probable cause to arrest the driver of the Mercedes. Article 140 of New York's Criminal Procedure Law provides, in pertinent part, that "a police officer may arrest a person for . . . any offense when he or she has reasonable cause to believe that such person has committed such offense in his or her presence." N.Y. C.P.L. §140.10(1). Section 155 of New York's Vehicle and Traffic Law (the "VTL") expressly provides that "[f]or purposes of arrest without a warrant, pursuant to article one hundred forty of the criminal procedure law, a traffic infraction shall be deemed an offense." In addition, the Supreme Court has held that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). Accordingly, if Waiters was the driver of the Mercedes, as he himself states, his seizure would not violate the Fourth or Fourteenth Amendment.

Even if Waiters was only a passenger, as Ortiz believed, the Officers did not violate Waiters' Fourth or Fourteenth Amendment rights by chasing and apprehending him. At the time Ortiz first saw the Mercedes, he and his fellow officers were responding to a call of shots fired at the Holland Houses. Ortiz was well aware that the Holland Houses complex was a high-crime

area because he alone had responded to 50 or 60 reports of violent crimes in that apartment complex during his 11½-year tenure with the 120 Precinct's Anti-Crime Unit.

As the officers approached the Holland Houses, Ortiz observed the Mercedes speeding along the road bordering the southern edge of the apartment complex. It was just before 5:00 in the morning, and there was so little traffic on the streets that the officers had not activated their emergency lights or siren. The Mercedes not only ran a stop sign, but nearly collided with the officers' vehicle. Moreover, the Mercedes did not stop immediately after the officers turned on their emergency lights but continued into the parking lot of Holland Houses, where one of the passengers fled the vehicle. Despite the presence of the flashing lights on the police vehicle behind it, the Mercedes then drove further into the parking lot before Waiters and the other occupant also fled.

"Headlong flight – wherever it occurs – is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Thus, "[w]hen the noticed presence of officers provokes a suspect's headlong flight in a high crime area, the officers are justified in suspecting criminal activity on the part of the suspect and a *Terry* stop is warranted." *United States v. Muhammed*, 463 F.3d 115, 121 (2d Cir. 2006) (citing *Wardlow*, 528 U.S. at 125). In this case, Mr. Waiters' flight not only occurred in a high-crime area, but occurred shortly after the officers had received a report that shots had been fired in the vicinity. Moreover, Mr. Waiters emerged from a vehicle which was not only one of the few cars on the road, but which had been driving recklessly and at a "high rate of speed" (10), which had failed to stop immediately upon activation of the police

lights and siren, and which contained at least two occupants who had also fled. Under these circumstances, Ortiz had at least reasonable suspicion that criminal activity was afoot.[2]

Since Ortiz had reasonable suspicion, he was justified in detaining Waiters. Immediately upon effecting that detention, however, Ortiz discovered that Waiters was wearing a bullet proof vest. This discovery, coupled with the circumstances detailed above which gave rise to reasonable suspicion, gave Ortiz probable cause to arrest Waiters.

Even if the police lacked reasonable suspicion, this Court would not suppress the handgun recovered near the Mercedes. A defendant charged with crimes of possession may only claim the benefits of the exclusionary rule if his or her own Fourth Amendment rights have in fact been violated. *United States v. Salvucci*, 448 U.S. 83, 85 (1980). Waiters, whose affidavit asserts only that the police "claim to have recovered a . . . handgun from inside the [Mercedes]," Waiters Affidavit at ¶9, has not asserted either a property or a possessory interest in the Mercedes or any interest in the handgun which might enable him to seek exclusion of the gun.

Moreover, even assuming that Waiters possessed the handgun prior to fleeing the Mercedes, he had abandoned it by the time he was seized. In his Memorandum of Law in Support of his Motion to Suppress, Waiters urges this Court to conclude that he was seized as soon as the Mercedes came to a stop. Waiters Memorandum at 9. This Court cannot reach that conclusion.

---

[2]In a case very similar to the one at bar, the Third Circuit held that a passenger's flight from a non-consensual, legitimate traffic stop gives rise to reasonable suspicion, justifying the pursuing officer in tackling the fleeing passenger in order to detain him. *See United States v. Bonner*, 363 F.3d 213, 218 (3d Cir. 2004). However, no case in this Circuit has ever relied upon *Bonner*, which has been cited almost exclusively by other courts in the Third Circuit.

"A person is seized by the police . . . when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotations and citations omitted). Accordingly, a seizure or arrest "requires either physical force . . . or, where that is absent, submission to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphasis omitted). In cases in which the driver of a vehicle being stopped by the police submits to the show of authority manifested by the flashing turret lights and siren by pulling over and awaiting the arrival of a police officer, the driver and other occupants of the vehicle are deemed to be seized at the moment the car comes to a halt on the side of the road. *Brendlin*, 551 U.S. at 263; *Arizona v. Johnson*, 555 U.S. 323. 332 (2009). However, "to become seized[,] . . . a suspect must do more than halt temporarily . . . ." *United States v. Baldwin*, 496 F.3d 215, 218 (2d Cir. 2007) (internal quotations and citation omitted), *cert. denied*, 552 U.S. 1222 (2008). In cases in which the driver flees either immediately or shortly after bringing his car to a halt, the driver is not seized until physically apprehended by the police. *See*, *e.g.*, *United States v. Valentine*, 232 F.3d 350, 359 (3d Cir. 2000) ("Even if Valentine paused for a few moments and gave his name, he did not submit in any realistic sense to the officers' show of authority, and therefore there was no seizure until Officer Woodard grabbed him.") (cited with approval in *Baldwin*, 496 F.3d at 218).

In this case, Waiters admits that "in response to being stopped by the police," he ran from the Mercedes. Waiters Affidavit at ¶8. Accordingly, he was not seized at the moment the Mercedes came to a stop, but only when the officers physically subdued him. *See Baldwin*, 496 F.3d at 218. Waiters was not then in possession of the gun, which lay abandoned near the

9

Mercedes. Thus, regardless of whether the police had probable cause to stop the Mercedes or whether the Officers had reasonable suspicion to detain Waiters, the gun was not a fruit of Waiters' arrest. *See United States v. Swindle*, 407 F.3d 562, 572 (2d Cir. 2005) (drugs which were abandoned prior to a defendant's seizure "did not have to be suppressed as the fruit of a poisonous tree"); *United States v. Cuthbert*, 466 Fed. Appx. 46 (2d Cir. Mar. 16, 2012) (same).

## *CONCLUSION*

For the reasons set forth above, defendant Waiters motion to suppress "all physical evidence" taken from him at the time of his arrest as "fruits of an unreasonable seizure" is denied.

**SO ORDERED**.

/s/
SANDRA L. TOWNES
United States District Judge

Dated: November 30, 2012
      Brooklyn, New York